**UNITED STATE DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

AUDIOLOGY DISTRIBUTION, LLC, as
successor-in-interest to HEARUSA, INC.,

        Plaintiff**,**

v.

DONNA M. SIMMONS, individually and
d/b/a PHYSICIANS HEARING
SPECIALISTS, and DANELLE BOYCE
f/k/a DANELLE MONAGHAN, an
individual,

        Defendants.

Case No. 8:12-cv-02427-JDW-AEP

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT DANELLE
GALLEGOS' SECOND AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT
AND INCORPORATED MEMORANDUM OF LAW**

Plaintiff, Audiology Distribution, LLC ("ADL"), through counsel, hereby responds to

Defendant Danelle Gallegos' Second Amended Motion for Partial Summary Judgment and

Incorporated Memorandum of Law (the "Gallegos Motion") and submits the following

Memorandum of Law in opposition thereto.  ADL respectfully requests that this Court deny the

Gallegos Motion.

<u>**Introduction**</u>

This is a case where defendants Donna M. Simmons ("Simmons") and Danelle Gallegos

f/k/a Danelle Boyce f/k/a Danelle Monaghan ("Gallegos") (collectively, the "Defendants")

embarked on a calculated mission to destroy ADL's Sarasota-based audiology business.

Specifically, Defendants conspired to: (1) treat ADL's audiology patients at its offices while still

employed by ADL; (2) sell hearing aids to ADL's patients and accept payments for these sales

on the side; (3) advise ADL's patients at the time of their office visits that Simmons was moving

to a new location and Simmons could see them at her new location; (4) hide ADL's patient visits

and hearing aid purchases by not entering them into ADL's computer system; (5) photocopy approximately 3,000 ADL patient intake sheets; (6) provide ADL's patient intake sheets to Defendant Paige Ligon ("Ligon") to re-create ADL's patient list for Defendants' use; and (7) solicit ADL's patients via phone and mail using the information Defendants pirated from ADL. Despite their horrific conduct, Defendants, in two separate motions for partial summary judgment, ask this Court to exonerate them.  The Defendants' acts, in light of their contractual and legal obligations, warrant substantial damages, not exoneration.

Gallegos moved for partial summary judgment on Counts IV (breach of fiduciary duty), V (tortious interference) and VI (breach of contract against Gallegos).  The Gallegos Motion should be denied because: (1) the September 9, 2011 letter that ADL sent to Gallegos did not supercede Gallegos' Agreement to Protect Business Information and Not to Improperly Compete; (2) Gallegos had clear contractual, policy and legal obligations to maintain in strict confidence ADL's patient information; (3) ADL has several legitimate business interests that underly the restrictive covenants in Gallegos' agreement with ADL; and (4) ADL's claims for breach of fiduciary duty and tortious interference allege facts beyond Gallegos' misappropriation of trade secrets and are therefore not preempted by the trade secret statute.  Thus, ADL respectfully requests that this Court deny the Gallegos Motion.

## **Factual Background**

Prior to June 30, 2006, Simmons solely owned an audiology and hearing aid dispensing business known as Doctor's Hearing Center, Inc. ("DHC") located at 1700 South Osprey Avenue, Sarasota, Florida.  (Simmons Depo. p. 12, l. 9-13).  On June 30, 2006, HearUSA, Inc.

("HearUSA"), ADL's predecessor[1], entered into an Asset Purchase Agreement[2] with DHC, whereby HearUSA paid $2,250,000 to acquire all of DHC's assets (including DHC's patient list, associated goodwill and DHC's name).  (Simmons Depo. p. 21, l. 17-25; p. 22, l. 1-2; p. 23, l. 4-6; p. 27, l. 2-4).

On July 16, 2007, Gallegos, Simmons' assistant, executed a HearUSA Agreement to Protect Business Information and Not to Improperly Compete (the "Gallegos Agreement").  (Gallegos Depo. p. 34, l. 19-25; p. 35, l. 1-5, Exhibit 43 thereto).  Among other provisions, paragraphs 2 and 3 of the Gallegos Agreement prohibit Gallegos from disclosing HearUSA's confidential information and require Gallegos to return all confidential information at the conclusion of her employment.  Unlike paragraph 2, paragraph 3 does not have a five-year limitation.  Further, paragraph 3 expressly prohibits Gallegos from duplicating or removing from ADL's offices any of its Information (as defined in the Gallegos Agreement).  The information at issue in this case is specifically contemplated by paragraphs 2 and 3 of the Gallegos Agreement.  Defendants also fail to point out that the Gallegos Agreement contains a Survival Clause at paragraph 8.  Finally, paragraph 4 contains a covenant-not-to-compete that precludes Gallegos from working for a competing company for one year after her employment ends as well as a non-solicitation clause that prohibits Gallegos from soliciting ADL's patients whether on her own behalf or on behalf of any other entity or individual.

Gallegos also executed a series of agreements and policies designed to protect confidential patient information.  (Gallegos Depo. p. 36-43; Exhibits 44-50 thereto).  The Gallegos motion omits the fact that Gallegos executed a Policies Acknowledgment dated

---

[1] In September 2011, ADL acquired all of HearUSA's assets out of HearUSA's bankruptcy proceedings, including the agreements at issue in this matter.  Defendants' motions do not challenge ADL's acquisition of their agreements with HearUSA.

[2] A copy of the Asset Purchase Agreement is attached to Simmons' Amended Motion for Partial Summary Judgment as Exhibit B.

September 10, 2011, in which Gallegos acknowledged receipt and review of Siemens Business Conduct Guidelines, Code of Conduct Policy, Patent and Secrecy Agreement and Electronic Communication Policy.  (Gallegos Depo. p. 42, l. 18-25, Exhibit 50 thereto).[3]  The Policies Acknowledgment reflects that "these represent only some of the policies of Siemens AG and Siemens Healthcare" and that "a violation of any company policy may lead to discipline up to and including termination of employment."  (Gallegos Depo., Exhibit 50 thereto).  Although Gallegos cannot recall if she read Siemens' Business Conduct Guidelines or any of the policies referred to in the September 9, 2011 offer letter (Gallegos Depo. p. 42, l. 18-25; p. 43, l. 1-11, 23-25; p. 44, l. 1-25; p. 45, l. 1-7, Exhibits 50 and 51, thereto), the Business Conduct Guidelines, Code of Conduct Policy and Patent and Secrecy Agreement were among the materials sent via FedEx to Gallegos along with her offer letter.  (Aff. of Klein, ¶ 5, Exhibits 1, 2, 3 and 4 thereto). The Siemens' Business Conduct Guidelines contain sections on Fair Competition (Aff. of Klein, ¶ 5, Exhibit 1 thereto, Section B.1, p. 6), Competing with Siemens (Aff. of Klein, ¶ 5, Exhibit 1 thereto, Section C.1, p. 10-11), Sideline Work (Aff. of Klein, ¶ 5, Exhibit 1 thereto, Section C.2, p. 11), and Handling of Information (Aff. of Klein, ¶ 5, Exhibit 1 thereto, Section E, p. 12-14). The Employee Patent and Secrecy Agreement is an entire document dedicated to the protection of confidential and trade secret information.  (Aff. of Klein, ¶ 7, Exhibit 3 thereto).  Not surprisingly, Gallegos, who was on the verge of defecting, does not appear to have executed the Employee Patent and Security Agreement.  Finally, the Electronic Communication policy identifies permissible and impermissible uses of ADL's systems.  (Aff. of Klein, ¶ 7, Exhibit 4 thereto).

---

[3] As discussed in the documents, ADL is a subsidiary of Siemens and ADL's employees are required to abide by Siemens' corporate policies. *See* Exhibits 50-52 of Gallegos' Deposition.

Shortly after HearUSA announced its bankruptcy filing in May 2011 (Gallegos Motion, p. 3), Defendants determined they were going to leave HearUSA and plotted to start a competing audiology business.  (Simmons Depo. p. 41, l. 25; p. 42, l. 1-3; p. 45, l. 25; p. 46, l. 1-5).  Before Defendants announced their departure from ADL, they began to convert and misappropriate ADL's patients and ADL's confidential and/or trade secret patient information.

For instance, while still employed by ADL, Simmons conducted hearing tests on ADL's patients at ADL's Sarasota office and then sold hearing aids to patients without going through ADL so that she – rather than ADL – could realize the profits on the hearing aid sales. (Simmons Depo. p. 53, l. 11-24).  Simmons and Gallegos hid these patient visits and purchases by not entering them into ADL's computer system.  (Simmons Depo. p. 57, l. 4-25; p. 58, l. 1-8, 25; p. 59, l. 1-8; p. 224, l. 9-17).  Gallegos prepared contracts for these surreptitiously serviced patients on forms for "Doctors Hearing Center, Inc.," the very name and entity Simmons sold to ADL.  (Simmons Depo. p. 70, l. 1-25; p. 71, l. 1-25; p. 72, l. 1-17; p. 81, l. 20-25; Gallegos Depo. p. 51, l. 1-15; p. 53, l. 25; p. 54, l. 1-25; p. 55, l. 1-18; p. 57, l. 1-10).

Also while still employed by ADL, Defendants, knowing they could not print out ADL's patient list due to ADL's computer protection restrictions (Simmons Depo. P. 136, l. 9-23; Gallegos Depo., p. 70, l. 11-17), copied approximately 3,000 ADL patient intake sheets. (Simmons Depo. p. 117, l. 25; p. 118, l. 1-25; p. 119, l. 1-5; Gallegos Depo. p. 24, l. 19-25; p. 26, l. 1-3; p. 26, l. 1-3; p. 27, l. 8-20).  At the time Gallegos was copying ADL's patient intake sheets, she knew Simmons intended to take them out of ADL's offices.  (Gallegos Depo. p. 41, l. 4-9).  Gallegos also knew that under ADL's policies, charts were to remain in the office. (Gallegos Depo. p. 40, l. 20-25; p. 41, l. 1-3).  The patient intake sheets contained patient names,

addresses, phone numbers and/or medical information.  (Simmons Depo. p. 163, l. 2-25; Gallegos Depo. p. 14, l. 11-15).

Simmons and Gallegos provided ADL's patient intake sheets to Paige Ligon, a third party wholly unrelated to ADL that Simmons personally retained.  (Simmons Depo. p. 112, l. 23-25; p. 113, l. 1).  Ligon used the pirated patient intake sheets to recreate ADL's patient list for Simmons' new practice.  (Simmons Depo. p. 125, l. 14-21; p. 156, l. 13-25; p. 157, l. 1-9; p. 164, l. 5-10).  While Defendants were stealing the very patient files and goodwill for which Simmons received $2,250,000 just a few years earlier, ADL, unaware of Defendants' conduct, was paying Defendants their salary.  (Aff. of Klein, ¶10).  To further jump start her new practice, prior to resigning from ADL, Simmons notified some of ADL's patients that she was leaving and advised them of her new practice location.  (Simmons Depo. p. 47, l. 21-25; p. 48, l. 14-17; p. 49, l. 1-3; p. 53, l. 1-10; p. 134, l. 14-19).

On September 9, 2011, ADL acquired substantially all of HearUSA's assets, including HearUSA's rights under the Asset Purchase Agreement, the Gallegos Agreement, as well as the other documents attached to the Amended Complaint as Composite Exhibits 2 and 4.  (Aff. of Klein, ¶ 4).  Upon ADL's acquisition of HearUSA's assets, Simmons and Gallegos became employees of ADL.  (Aff. of Klein, ¶ 4, FN 1).

On or around September 28, 2011, Simmons resigned from ADL.  (Simmons Depo. p. 60, l. 3-9).  In October 2011, Simmons opened her hearing aid dispensing business named Doctors Hearing, Inc.[4]  (Simmons Depo. p.7, l. 5-9; p. 83, l. 6-14).  It is undisputed that Simmons' hearing aid business competes directly with ADL and is less than one mile from ADL. On or around October 17, 2011, Gallegos resigned from ADL.  (Gallegos Depo. p. 23, l. 1-4).

---

[4] Simmons stopped using the name Doctors Hearing, Inc. after receiving a cease and desist letter from ADL, but it took her well over a year to make this change with the Secretary of State.  (Simmons Depo. p. 131, l. 1-25; p. 132, l. 1-10; Exhibit 18 thereto).  Simmons now uses the name Physicians Hearing Specialists, Inc. ("PHS").  (Id.).

Immediately thereafter, Gallegos began working with Simmons at her new hearing aid business. (Gallegos Depo. p. 23, l. 1-4; p. 21, l. 11-13).

After Simmons opened her new practice, Defendants used ADL's confidential patient information to solicit ADL's patients via phone and mail.  (Simmons Depo. p. 111, l. 21-25; p. 112, l. 1-12; p. 113, l. 12-15; p. 125, l. 14-25; p. 126, l. 1-5; Gallegos Depo. p. 29, l. 11-25; p. 30, l. 1-20; p. 31, l. 2-11).  Defendants sent out mailers to ADL's patients using the information they took from ADL's office and called ADL's patients (using ADL's information) to inform the patients of Simmons' new practice. (Simmons Depo. p. 156, l. 13-25; p. 157, l. 1-9; Gallegos Depo. p. 29, l. 11-25; p. 30, l. 1-20; p. 31, l. 2-11; p. 71, l. 14-21).  Within months of Simmons' departure, she had seen over 100 ADL patients, all of which were on the list Ligon secretly created.  (Simmons Depo. p. 167, l. 20-23).

ADL requested Defendants produce copies of all information they took from ADL. Defendants produced a patient list containing approximately 1,300-1,400 names.  ADL then discovered emails between Simmons and Ligon whereby Ligon advised Simmons that the list exceeds 3,000 names.  Once confronted with these emails, Defendants suddenly located a patient list containing approximately 3,000 names, all of which came from ADL's patient files and all of which Defendants used to send mailers to ADL's patients.

## Memorandum of Law

**I.     The Gallegos Agreement Was Not Superseded by ADL's September 9, 2011 Offer Letter**.

In the Gallegos Motion, Gallegos alleges that she is entitled to summary judgment on ADL's claim for breach of the Gallegos Agreement because she entered into a new "September 2011 Agreement" with ADL that superseded the July 16, 2007 Gallegos Agreement.  (Gallegos Motion, p. 6-9).  Gallegos claims that, because the purported "September 2011 Agreement" did

not have a confidentiality obligation, it had the effect of eliminating the confidentiality obligations of the Gallegos Agreement.  Quite simply, the purported "September 2011 Agreement" is nothing more than an offer letter ADL sent to Gallegos, which Gallegos failed to accept according to the terms of the offer.[5]  This letter was not a novation, did not contain a merger clause and did not supercede the Gallegos Agreement.  As such, the Gallegos Motion should be denied to the extent it seeks summary judgment on ADL's breach of contract claim.

The "September 2011 Agreement" is merely an offer letter that expressly states it is not an agreement.  The letter does not contain a merger clause and does not purport to release Gallegos from her prior obligations to ADL.  The letter advises Gallegos that ADL acquired HearUSA and is the "new HearUSA!" and offers to employ Gallegos as Office Manager beginning September 9, 2011.  (Gallegos Depo., Exhibit 51 thereto).  However, the letter expressly states that the "offer is not to be construed as an employment contract." (*Id.*)  Despite this language, Gallegos characterizes the letter as the "September 2011 Agreement" and fails in her argument to mention this provision.  The letter also says that Gallegos' employment with ADL will be subject "various human resource policies and procedures" and that Gallegos employment "is conditioned upon the execution of certain documents." (*Id.*)  Thus, contrary to Gallegos' assertion, not only is the letter not an agreement, but it openly contemplates that other documents will govern the parties' relationship, the exact opposite of a merger clause.  Indeed,

---

[5] Gallegos attempts to instruct the Court on the basic contract law principles of "offer," "consideration" and "acceptance."  However, Gallegos fails to mention that for the acceptance of an offer to result in a contract, the acceptance must be: (1) absolute and unconditional; (2) ***identical with the terms of the offer***; and (3) in the mode, at the place, and within the time expressly or impliedly required by the offer. *Strong & Trowbridge Co. v. H. Baars & Co.*, 54 So. 92, 93-94 (Fla. 1910)(emphasis added).  In other words, the offeree must accept the offer in the exact manner proscribed by the offer.  Gallegos' "acceptance" of the "September 2011 Agreement" was not identical with the terms of the offer and therefore did not constitute acceptance.  The "Confirmation of Acceptance" specifically stated "I understand that my offer of employment is conditioned upon the execution of certain documents."  ADL sent Gallegos those "certain documents," via FexEd, in the same envelope as the "September 2011 Agreement."  Gallegos' execution of those "certain documents" and the "September 2011 Agreement" was required for proper acceptance of the offer.  Gallegos did not accept the offer according to its express terms because Gallegos did not execute all of the documents sent alongside the "September 2011 Agreement."  Therefore, Gallegos did not accept the purported "September 2011 Agreement."

Gallegos does not tell this Court that she executed the Siemens' Policies Acknowledgment wherein she acknowledged receipt and review of Siemens' Business Conduct Guidelines, Code of Conduct Policy, Patent & Secrecy Agreement and Electronic Communication policy. (Gallegos Depo., Exhibit 50 thereto). All of these documents and policies are designed to safeguard ADL's confidential information and property. (Aff. of Klein, ¶5, Exhibits 1, 2, 3 and 4 thereto). Finally, it is also important to note the letter says that "this Offer Letter encompasses the entire promises, commitments, representations, statement of facts, and intentions set forth by *Audiology Distribution, LLC* concerning this offer of employment." (*Id.*) (*emphasis added*). Thus, the only obligations affected by the letter are those owed by ADL to Gallegos. The letter does not reference, alter, amend, modify or release in any way Gallegos' obligations to ADL.

Even if this Court were to consider Gallegos' novation argument, the result would be the same because the September 2011 letter is missing at least three elements required to show a novation. "A novation is a mutual agreement between the parties for the discharge of a valid existing obligation by the substitution of a new valid obligation." *Aronowitz v. Health-Chem Corp.*, 513 F. 3d 1229, 1237 (11th Cir. 2008)(citing *Jakobi v. Kings Creek Vill. Townhome Ass'n*, 665 So. 2d 325, 327 (Fla. 4th DCA 1995)). In order to establish a novation, Gallegos must show: (1) a previously valid contract; (2) an agreement of the parties to cancel that contract; (3) a new valid and binding contract; (4) an agreement of the parties that the new contract will replace and extinguish the old one. *Aronowitz*, 513 F. 3d at 1237. Gallegos cannot make such a showing.

First, nowhere in the letter is there an indication that the parties agreed to cancel the Gallegos Agreement. The Gallegos Agreement is not referenced in any manner in the letter, nor are the other documents Gallegos executed to protect ADL's confidential information. (Gallegos

Depo., Exhibits 44-50 thereto).  Second, the letter does not indicate that the "new contract" will replace and extinguish the old ones.  The only obligations discussed in the letter are ADL's. Third, the letter expressly states that it is not to be construed as a contract.

Ironically, the cases Gallegos cites find either that there was not a novation (*Thompson v. Jared Kane Co., Inc.*, 872 So. 2d 356, 360-61 (Fla. 2d DCA 2004)) or that the "question of intent 'is generally a question of fact'" . . . unless "[h]owever, '[w]here the terms of a written agreement are not in doubt, the question of whether it effects a novation is one of law for the court.'"  *Aronowitz*, 513 F.3d at 1237.  Here, there is not even a subsequent agreement.  There is merely a letter that states that it is not a contract and it specifically references other obligations. There is no evidence that shows that ADL intended to release Gallegos from her obligations so as to constitute a novation.  In the absence of evidence demonstrating the parties' intent, a novation cannot be construed to have occurred.  *See Seawell v. Hargarten*, 28 So. 3d 152, 155 (Fla. 1st DCA 2010); *Flora De La Cuevas v. Nat'l Enter. Inc.*, 927 So. 2d 41, 43-44 (Fla. 3d DCA 2006); *Estate of Mary Grace Johnston v. TPE Hotels, Inc.*, 719 So. 2d 22, 25-26 (Fla. 5th DCA 1998).[6]

## II.     Gallegos Mischaracterizes ADL's Amendment of its Complaint in an Effort to Confuse the Court

Gallegos argues ADL amended its complaint to "cobble together an argument that it has a private cause of action against [Gallegos] pursuant to various internal policies and procedures" (the "Policies").  (Gallegos Motion, p. 5)  Gallegos then argues that the Policies are not enforceable contracts, were not intended to create a private cause of action against Gallegos for

---

[6] Although the Gallegos motion does not appear to seek summary judgment on ADL's trade secret claim, it implies in several places that, after she executed the September 9, 2011 letter, Gallegos had no obligation to protect ADL's trade secrets.  However, as discussed in ADL's response to Simmons' motion for partial summary judgment, a trade secret claim is not dependent on the existence of a confidentiality agreement. *Lee v. Cercoa*, 433 So. 2d 1 (Fla. 4th DCA 1983)(finding that employee is under a duty to protect employer's trade secrets even in the absence of a contract).  ADL could assert a trade secret claim even in the absence of a confidentiality agreement so long as it took reasonable measures to protect its trade secret, which ADL most certainly did here.

monetary damages, and either way, such damages were not contemplated by the parties. (Gallegos Motion, p. 5)  Gallegos' argument mischaracterizes ADL's allegations and its use of the Policies.

As discussed above, the "September 2011 Agreement" is not a novation.  ADL bases its breach of contract claim squarely on Gallegos' breach of the Gallegos Agreement.  Contrary to Gallegos' argument, Gallegos' breach of the Policies is purely secondary.  Likewise, ADL is not seeking to bring a cause of action for misappropriation of trade secrets based on the Policies.  To the contrary, ADL included the Policies in its Amended Complaint as further evidence of the measures ADL took to protect confidential patient information.[7]  *See Sensormatic Elecs. Corp v. Tag Co. US, LLC*, 632 F. Supp. 2d 1147, 1185 (S.D. Fla. 2008)(holding that plaintiff took reasonable efforts to maintain the secrecy of its specifications by requiring its employees to sign confidentiality agreements upon their hire); *Southeastern Mech. Servs. v. Brody*, 2008 U.S. Dist. LEXIS 123211, *36-37 (M.D. Fla. 2008)(holding that plaintiff made reasonable efforts to maintain the secrecy of its propriety information by, among other things, requiring its employees to sign a confidentiality agreement and instituting certain confidentiality policies)(citing *Green Fiber v. Brooks, No. 02-2215*, 2002 U.S. Dist, LEXIS 27944, at *12 (W.D. La 2002)(plaintiff took reasonable efforts to maintain the secrecy of information by instituting a confidentiality policy and by using password protection to limit access to this information to authorized employees)).

Gallegos' mischaracterization of ADL's Amended Complaint should not be allowed to muddle the issues before the Court.  A "trade secret" is information that (1) derives economic value from not being readily ascertainable by others and **(2) is the subject of reasonable efforts**

---

[7] "Whether a trade secret was the subject of reasonable efforts under the circumstances to maintain its secrecy is a fact-intensive determination." *Jadael Inc. v. Elliott*, 2007 U.S. Dist. LEXIS 63696 *23-24 (M.D. Fla. 2007).

**to maintain its secrecy.** *Am. Red Cross v. Palm Beach Blood Bank*, 143 F, 3d 1407, 1410 (11th Cir, 1998)(emphasis added).   ADL's inclusion of *additional* efforts to protect its trade secrets and confidential information only bolsters ADL's claim and responds to Gallegos' Ninth Affirmative Defense wherein Gallegos alleged ADL did not have measures in place to protect its patient information.   For all of these reasons, the Gallegos Motion should be denied.

### III.   Pursuant to the Non-Compete Statute, § 542.335, *Florida Statutes*, ADL Has Several Legitimate Business Interests Underlying the Gallegos Agreement.

The Gallegos Motion contends that ADL's breach of contract claim fails for the additional reason that the Gallegos Agreement is an invalid restrictive covenant under § 542.335, *Florida Statutes,* because ADL does not have a legitimate business interest.  (Gallegos Motion, p. 13-16).  Under §§ 542.335(1)(b)(1), (1)(b)(2), (1)(b)(3) and (1)(b)(4), ADL has a legitimate business interest in its: (1) trade secrets; (2) valuable confidential business or professional information that otherwise does not qualify as trade secrets; (3) substantial relationships with its existing and prospective patients; and (4) patient goodwill.  The purpose of the Gallegos Agreement's confidentiality and non-solicitation obligations is to protect these legitimate business interests as contemplated by the statute.  A compilation of patient information/customer contact information that has been collected and stored over a period of years is precisely the type of information the non-compete statute is designed to protect.  *Vas Aero Servs., LLC v. Arroyo,* 860 F. Supp. 2d 1349, 1359 (S.D. Fla. 2012); *Marine Turbo Eng'g, Ltd. v. Turbocharger Servs. Worldwide, LLC,* 2011 U.S. Dist. LEXIS 147583 at *26 (S.D. Fla. 2011); *East v. Aqua Gaming, Inc.*, 805 So. 2d 932, 934 (Fla. 2d DCA 2011).  Likewise, customer/patient relationships and patient goodwill are routinely recognized as legitimate business interests that warrant enforcement of a restrictive covenant agreement.  *Ameripath, Inc. v. Wetherington,* 2011 U.S. Dist. LEXIS 36389 at *20-21 (S.D. Fla. 2011); *Int'l Hair & Beauty, LLC. v. Simply Organ, Inc.,*

2011 U.S. Dist. LEXIS 127336 at *27-28 (M.D. Fla. 2011); *N. Am. Prods. Corp. v. Moore,* 196 F. Supp. 2d 1217, 1231 (M.D. Fla. 2001).

Gallegos contends that, because she is a not a board certified audiologist, she could not have used the information she stole from ADL, and thus, the agreement is void. (Gallegos Motion, p. 8). When analyzed against Gallegos' actions, this argument is laughable. Gallegos admitted that she assisted Simmons in copying approximately 3,000 ADL patient intake files while still employed by ADL. (Simmons Depo. p. 117, l. 25; p. 118, l. 1-25; p. 119, l. 1-5; Gallegos Depo. p. 24, l. 19-25; p. 26, l. 1-3; p. 26, l. 1-3; p. 27, l. 8-20). Simmons testified that she sold hearing aids to ADL's patients on the side, accepted money on the side, she instructed Gallegos not to enter the patient visits and sales into ADL's system and Gallegos followed these instructions. (Simmons Depo. p. 53, l. 11-24; p. 57, l. 4-25; p. 58, l. 1-8, 25; p. 59, l. 1-8; p. 224, l. 9-17; Gallegos Depo. p. 51, l. 1-15; p. 53, l. 25; p. 54, l. 1-25; p. 55, l. 1-18; p. 57, 1-10). After Gallegos and Simmons stole information for 3,000 of ADL's patients and started a competing practice less than a mile away, Simmons and Gallegos sent mailers and placed phone calls to ADL's patients to notify them of Simmons' new practice. (Simmons Depo. p. 111, l. 21-25; p. 112, l. 1-12; p. 113, l. 12-15; p. 125, l. 14-25; p. 126, l. 1-5; Gallegos Depo. p. 29, l. 11-25; p. 30, l. 1-20; p. 31, l. 2-11).

Gallegos was not merely complicit in Simmons' scheme, Gallegos was a willing and active participant that, like Simmons, attempted to destroy ADL's Sarasota audiology practice. Simmons' and Gallegos' actions have caused substantial damages. For Gallegos to contend that she cannot compete with ADL because she is not an audiologist is ridiculous. She was a key part of the conspiracy. Her actions are the very reason the noncompete statute exists, so that former

employees will not misappropriate the competitive advantage they gain while working for the former employer (*i.e.* confidential/trade secret information, patient relationships and goodwill).

## IV.     The Trade Secret Statute Does Not Preempt ADL's Claims for Breach of Fiduciary Duty and Tortious Interference.

The Gallegos Motion contends that Counts IV (breach of fiduciary duty) and V (tortious interference) are barred because § 688.008(2) pre-empts conflicting tort and common law causes of action.  (Gallegos Motion, p. 16-18).  Because these counts allege wrongdoing beyond Gallegos' misappropriation of confidential information, the trade secret statute does not preempt these claims.  In order for tort or common law claims to survive the statute's preemption provision, "there must be material distinctions between the allegations comprising the additional torts and the allegations supporting the FUTSA claim."  *New Lenox Indus., Inc. v. Fenton*, 510 F. Supp. 2d 893, 908 (M.D. Fla. 2007).  A state law claim may allege facts asserted in a FUTSA claim, but 'if the allegations of trade secret misappropriation *alone* comprise the underlying wrong, only the FUTSA claim will survive the motion to dismiss.'"  *Mortgage Now, Inc. v. Stone*, 2009 U.S. Dist. LEXIS 110222, *24 (N.D. Fla. 2009)(citing *Am. Honda Motor Co. v. Motorcycle Info. Network Inc.*, 390 F. Supp. 2d 1170, 1181 (M.D. Fla. 2005)).

It is clear from a review of Counts IV and V that Gallegos' misappropriation alone does not comprise the entirety of the underlying wrong.  Paragraphs 55 and 56 of Count IV state that Defendants breached their fiduciary duty to ADL by selling hearing aids and other related services to ADL's patients (which occurred before and after Defendants stole ADL's information and resigned their employment) and misappropriating ADL's confidential information.  Count V likewise alleges in paragraph 63 that Defendants used improper means and ADL's confidential information to tortiously interfere with ADL's patient relationships.  Both Counts incorporate the general allegations wherein ADL alleges the Defendants improperly solicited ADL's patients

14

and sold them hearing aids while still employed with ADL.  As discussed in *Mortgage Now*, while these Counts contain misappropriation allegations that may overlap with the trade secret claim, these claims also allege additional duties that were breached and other ways in which the Defendants tortiously interfered with ADL's business relationships.  *Mortgage Now*, 2009 U.S. Dist. LEXIS at *25-26; *see also Alphamed Pharm. Corp. v. Arriva Pharm., Inc.*, 391 F. Supp. 2d 1148, 1167 (S.D. Fla. 2005)(holding that unfair competition claim was not preempted by § 688.008).  Thus, these claims are distinct from the trade secret claim and should remain.  *Id.*

ADL also points out that the non-compete statute, § 542.335, protects information that is a trade secret as well as confidential information that does not rise to the level of a trade secret. These are two separate categories of information and the trier of fact determines whether the information is trade secret, confidential or not confidential.  Counts IV and V both discuss confidential information.  Neither Count references trade secret information.  To the extent the trier of fact finds that the information is confidential, but not trade secret, ADL can be awarded relief under Counts IV and V.  Indeed, Defendants have denied that ADL's patient information is a trade secret.  ADL should be permitted to plead in the alternative and the trier of fact should be afforded the opportunity to determine if the information Defendants misappropriated is trade secret or confidential.  As such, ADL requests that this Court deny the Simmons Motion.

<u>Conclusion</u>

For the reasons discussed herein, ADL respectfully requests that this Court deny the Gallegos Motion.

15

Respectfully submitted,

FORD & HARRISON LLP


By: /s/ Edward B. Carlstedt
       Edward B. Carlstedt
       Florida Bar No. 136972
       ecarlstedt@fordharrison.com
       Loren J. Beer
       Florida Bar No. 072454
       lbeer@fordharrison.com

       *For the Firm*

       101 E. Kennedy Blvd., Suite 900
       Tampa, Florida 33602
       Telephone: (813) 261-7800
       Facsimile: (813) 261-7899
       Attorneys for Plaintiff


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 19, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to:

Philip Hammersley
phammersley@nhlslaw.com
Erik Hanson
ehanson@nhlslaw.com
Norton, Hammersley, Lopez & Skokos, PA
1819 Main Street, Suite 610
Sarasota, Florida 34236


       /s/ Edward B. Carlstedt
       Attorney

TAMPA:348903.1