UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

AUDIOLOGY DISTRIBUTION, LLC,

      Plaintiff,

vs.                                    Case No. 8:12-cv-02427-JDW-AEP

DONNA M. SIMMONS et al.,

      Defendants.

_____/

## ORDER

**BEFORE THE COURT** are Defendant Donna Simmons' Second Amended Motion for Partial Summary Judgment (Dkt. 61) and Defendant Danelle Gallegos' Second Amended Motion for Partial Summary Judgment (Dkt. 62). Plaintiff responded in opposition to each motion (Dkts. 66, 67), and Simmons replied in support of her motion for partial summary judgment (Dkt. 76). Upon consideration, the motions (Dkts. 61, 62) are GRANTED *in part* and DENIED *in part*. The motions are granted to the extent that HearUSA's internal policies and procedures do not create enforceable contractual obligations, and Simmons's motion is granted to the extent that Section 7(a)(i)(B) of the Employment Agreement is unreasonable in duration and is modified to be effective for six months after Simmons terminated her employment with Audiology. In all other respects, the motions are denied.

## I.   INTRODUCTION

### A.   *HearUSA Acquires Doctor's Hearing Center.*

Defendant Donna Simmons was the long-time owner and sole shareholder of an audiology

1

and hearing aid business known as Doctor's Hearing Center, Inc., where Danelle Gallegos[1] worked as her assistant (Dkt. 47 ¶¶ 12, 20; Dkt. 55 ¶¶ 7, 10). On June 30, 2006, HearUSA, Inc. entered into an Asset Purchase Agreement to acquire the assets of Doctor's Hearing Center, including all "confidential or proprietary information" and "patient . . . files and records" (Dkt. 61-4; Dkt. 47 ¶¶ 15, 16; Dkt. 55 ¶ 7). On the same day, Simmons executed an Employment Agreement (Dkt. 61-7) and a Non Compete and Confidentiality Agreement (Dkt. 61-8).

Under the Employment Agreement, Simmons became HearUSA's Regional Manager for Southwest Florida for an "employment period" of three years, beginning June 30, 2006 (Dkt. 61-7). Section 7 of the Employment Agreement addressed confidential information and customer lists:

> 7.  <u>Confidentiality; Return of Property.</u>
>
> (a)  Employee acknowledges that Employee's work for the Company is expected to bring Employee into close contact with various confidential business data of the Company, its contracting parties, affiliates and customers not readily available to the public. Accordingly, Employee:
>
> (i) covenants and agrees that (A) during the Employment Period, except pursuant to appropriate safeguards on confidentiality and only in connection with the business of the Company and (B) *after the Employment Period, on any basis for any reason, Employee shall not use or disclose to anyone except authorized personnel of the Company or the Company's Affiliates* (as defined below), whether or not for Employee's benefit or otherwise, *any confidential matters* (collectively, "Confidential Matters") concerning the Company or its suppliers, consultants, agents, other contracting parties or customers, whether such customers are deemed former, current or potential customers (collectively, the "Clients"), *including without limitation* all confidential technical information of the Company, secrets, trade secrets, proprietary software, copyrights, *Client lists, lists of employees,* . . . and other confidential business affairs, learned by the Employee, whether before or after the date hereof, concerning the Company, its Clients or a third party, including without limitation any [affiliates of the Company]; and
>
> (ii) covenants and agrees that (A) all confidential memoranda, notes, lists (including, without limitation, mailing and *Client*

---

[1]Gallegos was formerly known as both Danelle Boyce and Danelle Monaghan. For consistency, her current last name, Gallegos, is used throughout this Order.

*lists*), records and other confidential documents, whether in written, electronic or other form (and all copies thereof) made or compiled by Employee or made available to him concerning the Company, its Clients and any Affiliates whether before or after the date hereof are the *sole property of the Company*, and (B) if such documents are in the possession or control of Employee, *Employee shall deliver them*, without retaining any copies thereof, to the Company promptly *at the time of Employee's termination of employment* or at any other time upon request by the Company.

(Dkt. 61-7 ¶ 7, at 5) (emphasis added).[2]

The Non Compete and Confidentiality Agreement (Dkt. 61-8) prohibited Simmons from competing with HearUSA within a specific geographic area, soliciting HearUSA customers, or hiring HearUSA staff for three years from her hire date (*id.* ¶ 1, at 2-3). The Agreement also required Simmons to agree "that for a period of THREE (3) years from the date hereof," she would not "directly or indirectly use or divulge . . . trade secrets or confidential proprietary information," including "customer data" (*id.* ¶ 2, at 3).

When it acquired Doctor's Hearing Center, HearUSA hired Gallegos as an administrative assistant to Simmons (Dkt. 62-1 at 7:23-24). On July 16, 2007, Gallegos executed the Agreement to Protect Business Information and Not to Improperly Compete (the "2007 Gallegos Agreement") (Dkt. 47-3), which contained confidentiality (*id.* ¶ 2), trade secret (*id.* ¶ 3), and non-compete (*id.* ¶ 4) provisions.[3] Contemporaneously with the 2007 Gallegos Agreement, Gallegos also signed various

---

[2]Citations to page numbers are to the page numbers automatically generated by the CM/ECF filing system, not the page number of the original documents. Deposition transcripts are the exception, where citations are to the page and line of the deposition transcript.

[3]In pertinent part, the 2007 Gallegos Agreement provides:

> 2.    Confidential Information.  Employee shall not, for a period of five (5) years, divulge, disclose or communicate to any third party (whether an individual, partnership, or any other entity) or use for any entity or person's benefit:
>
>> Information relating to HearUSAs [sic] . . . customer information or research, the identity of any customers, customer lists, pricing information, cost information, customer prospects and any other information relating to the actual or potential customers of HearUSA, whether retail or wholesale . . . .
>
> 3.    Return of Information.  Employee agrees that under no circumstances and at no time shall this Information,

documents addressing HearUSA's internal policies and procedures.[4]

### B.    *Audiology Acquires HearUSA.*

HearUSA filed a voluntary petition for Chapter 11 bankruptcy on March 16, 2011.[5] Plaintiff

Audiology Distribution acquired substantially all of HearUSA's assets in the bankruptcy proceeding

on September 9, 2011 (Dkt. 61 at 5; Dkt. 66 at 6; Dkt. 61-6 ¶ 5).

On the same day, Audiology sent Simmons a letter titled "Employment Offer" (Dkt. 61-9).

In the letter, Audiology "offer[ed]" Simmons "employment as a[n] Audiologist" (*id.*). The letter also

stated that Simmons's "hire date [would] be [her] original hire date with HearUSA" (*id.*). Appended

to the letter was a Covenant Not-To-Compete. Simmons never signed the letter and did not accept

---

in any form, be taken from Employer's premises and under no circumstances and at no time shall this information be duplicated or transmitted, in whole or in part, without the express written permission of Employer. Employee agrees that, upon termination of employment with Employer for any reason, Employee shall return to Employer all lists, materials, manuals, documents, disks, software, tapes and other materials or information of Employer, which are in Employee's possession, regardless of the form in which these materials exist including copies or things containing said information.

4.  Non-Competition. As of the date hereof, and during the term of Employee's employment, and for a period of one (1) year after Employee's separation from employment with Employer, for any reason other than a staff reduction, and within the geographical area of a thirty (30) mile radius of any HearUSA center at which Employee has been employed. Employee shall not, directly or indirectly [compete with HearUSA, solicit HearUSA's customers, or offer employment to HearUSA employees].

. . . .

8.  Survival. All covenants, agreements, representations and warranties made in this Agreement or otherwise made in writing by any party pursuant hereto shall survive the execution and delivery of this Agreement, assignment of this Agreement and the termination of employment of Employee.

. . . .

11.  Assignment. The rights made or granted by Employee in this Agreement, are assignable by the HearUSA [sic] and are for the benefit of the Company's successors, assigns, and parties contracted with the Company.

(Dkt. 47-3 ¶¶ 2-4, 8, 11, at 1-3).

[4]The policies and procedures included a software policy (Dkt. 62-1 at 38), employee usage guidelines (*id.* at 39), employee home software usage guidelines (*id.* at 40), a confidentiality agreement in which Gallegos agrees to "maintain the confidentiality of . . . patient information disclosed to me in connection with my activity in the credentialing operations and process of any HEARx business" (*id.* at 42), a patient information confidentiality policy (*id.* at 43), and an acknowledgment that she received a copy of the HearUSA employee handbook (*id.* at 45). *See also id.* at 36:23–42:15.

[5]*See In re HearUSA, Inc.*, Case No. 11-23341-EPK (Bankr. S.D. Fla. 2011).

Audiology's offer of employment. Instead, she left her position at HearUSA (by then acquired by Audiology) on September 28, 2011, and started her own hearing aid business, Physicians Hearing Specialists, Inc.[6]

Gallegos received a similar letter from Audiology (the "2011 Gallegos Letter") offering her the position of Office Manager (Dkt. 62-3), which Gallegos signed and accepted.[7] Sent with the 2011 Gallegos Letter was a set of documents including the Siemens Policies Acknowledgment, which Gallegos signed, certifying that she read and understood various Siemens[8] policies, including the

---

[6]Simmons's new hearing aid business was first called Doctor's Hearing, Inc., but is now known as Physicians Hearing Specialists, Inc.

[7]In pertinent part, the 2011 Gallegos Letter provides:

Audiology Distribution, LLC d/b/a HearUSA, a Siemens Hearing Instruments, Inc. company (hereinafter the "Company"), is pleased to offer you employment as a [sic] Office Manager at an hourly pay rate of $18.63, effective on or about September 9, 2011. Insofar as length of company service may be the basis for assessment of entitlement to a Company's benefit, your deemed date of joining the Company shall be your original hire date with Hear USA, Inc.

. . . .

This offer is not to be construed as an employment contract. All employees of the Company are employees at will. This means that either the employee or the Company can terminate the employment at any time. There are no other provisions regarding conditions of employment except as indicated in this letter.

. . . .

To indicate your understanding and acceptance of the above, please sign and return to your HR Representative along with your completed I-9 form and your Policy Acknowledgment within three days of receipt.

. . . .

[signature of Audiology personnel]

CONFIRMATION OF ACCEPTANCE

**I understand that my offer of employment is conditioned upon the execution of certain documents. I also understand that by accepting this offer, I am confirming that I have read, understand, accept, and agreeing [sic] as indicated by my acceptance to be legally bound to the terms and conditions contained in the following documents attached hereto:**

• This offer of Office Manager described by the attached offer letter dated September 9, 2011, and that *this Offer Letter encompasses the entire promises, commitments, representations, statement of facts, and intentions set forth by Audiology Distribution, LLC concerning this offer of employment.*

(Dkt. 62-3) (final emphasis added).

[8]Siemens is Audiology's parent company.

Business Conduct Guidelines, Code of Conduct, Electronic Communication Policy, and the Employee Patent & Secrecy Agreement (Dkt. 62-1 at 48; Dkt. 39 ¶ 5). Gallegos retained the position of Office Manager with Audiology until she was terminated on October 17, 2011 (Dkt. 62-1 at 23:3-11). After the termination, she immediately began working with Simmons at Physicians Hearing Specialists (*id.* at 23:1-4).

### C.   *Simmons and Gallegos Copy Patient Information Sheets While Working for HearUSA and Audiology.*

Simmons and Gallegos admit that they copied patient information sheets and charts at Audiology's Osprey, Florida office and took the copies with them after leaving Audiology (Dkt. 61-1 at 117:25–120:6, 121:16-19; Dkt. 62-1 at 24:19-25). The patient information sheets were provided to Paige Ligon, Simmons's accountant, who created a master client list from the files (Dkt. 61-1 at 164:5-10; Dkt. 62-1 at 29:3-9). The client list and the information obtained from the patient information sheets were used to send direct mail soliciting Audiology's clients (Dkt. 61-1 at 125:22–126:5), and to call "[a] few" clients to inform them of Simmons' move (Dkt. 61-1 at 111:25–112:6; Dkt. 62-1 at 29:11-20). Since starting Physicians Hearing Specialists, Simmons has seen over one hundred former patients of Audiology's who were on the list compiled by Ligon (Dkt. 61-1 at 167:20-23).

### D.   *Simmons Sells Products to Audiology Customers.*

While working for Audiology and before leaving to start Physicians Hearing Specialists, Simmons sold three hearing aids to Audiology clients at Audiology's office "through sources other than" Audiology. Simmons purchased the hearing aids wholesale and then retained the revenue without processing the purchase through Audiology (Dkt. 61 at 6 n.3; Dkt. 61-1 at 71:14–73:22, 81:20–82:6).

It is therefore undisputed that Simmons and Gallegos copied client information sheets while

working at Audiology, gave that information to Ligon to compile a master client list, used the list to solicit Audiology clients through mail and over the phone, and sold hearing aids to Audiology customers in Audiology's office and retained the income without informing Audiology.

### E.   *The Complaint.*

Audiology's operative complaint alleges six causes of action against Simmons, Gallegos, Ligon, and Physicians Hearing Specialists (Dkt. 47). Count I is a claim for breach of contract against Simmons for allegedly breaching the confidentiality provisions of her Employment Agreement and for breaching "the agreements and policies attached as Composite Exhibit 2" (Dkt. 47 ¶¶ 43, 44). Count II alleges that Defendants misappropriated trade secrets in violation of the Florida Uniform Trade Secrets Act, § 688.001 *et seq.*, *Florida Statutes*, by taking patient contact and medical history information from Audiology for use in converting clients to Simmons's new business (Dkt. 47 ¶¶ 47-52). Count III is a claim for misappropriation of corporate opportunities against Simmons and Gallegos based on their outside sales of hearing aids and related services to patients while at Audiology (*id.* ¶¶ 55-58). Count IV alleges that Simmons and Gallegos breached their fiduciary duties owed to Audiology (*id.* ¶¶ 63-65). Count V is a claim for tortious interference with advantageous business relationships brought against all four Defendants (*id.* ¶¶ 68-72). And Count VI is a claim for breach of contract against Gallegos for allegedly breaching the confidentiality and non-compete provisions of the 2007 Gallegos Agreement (*id.* ¶¶ 74-78).

## II.   STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine factual dispute exists only if a reasonable fact-finder 'could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict.'" *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir.

2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is material if it may affect the outcome of the suit under the governing law. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine disputes of material fact that should be decided at trial. *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the moving party fails to demonstrate the absence of a genuine dispute, the motion should be denied. *Kernel Records*, 694 F.3d at 1300 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 606-08 (11th Cir. 1991)). Once the movant adequately supports its motion, the burden shifts to the nonmoving party to show that specific facts exist that raise a genuine issue for trial. *Dietz v. Smithkline Beecham Corp.*, 598 F.3d 812, 815 (11th Cir. 2010).

The evidence presented must be viewed in the light most favorable to the nonmoving party. *Ross v. Jefferson Cnty. Dep't of Health*, 701 F.3d 655, 658 (11th Cir. 2012). "Although all justifiable inferences are to be drawn in favor of the nonmoving party," *Baldwin Cnty. v. Purcell*, 971 F.2d 1558, 1563-64 (11th Cir. 1992), "inferences based upon speculation are not reasonable." *Marshall v. City of Cape Coral*, 797 F.2d 1555, 1559 (11th Cir. 1986). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine dispute over a material fact, the court should not grant summary judgment. *Samples ex rel. Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1998).

## III.   COUNT I: BREACH OF CONTRACT AGAINST SIMMONS

Count I alleges that Simmons breached the confidentiality provisions of the Employment Agreement (Dkt. 61-7) and HearUSA's internal policies and procedures by taking and using

8

confidential patient information for her new business. Simmons argues that she is entitled to summary judgment on Count I for two reasons: First, the confidentiality provisions of the Employment Agreement expired on June 30, 2009. Second, the internal policies and procedures do not constitute an enforceable contract.

### A.     The Confidentiality Provisions of the Employment Agreement Did Not Expire.

#### 1.     The Employment Agreement, the Asset Purchase Agreement, and the Non Compete and Confidentiality Agreement Are Construed Together.

Simmons argues that the breach of contract claim in Count I fails because her confidentiality obligations in the Employment Agreement expired in 2009. The interpretation of a written contract, including the question of whether a contract is ambiguous, is a matter of law. *DEC Elec., Inc. v. Raphael Constr. Corp.*, 558 So. 2d 427, 428 (Fla. 1990). Where the contract is unambiguous, it must be interpreted in accordance with its plain meaning so as to give effect to the contract as a whole. *Wash. Nat'l Ins. Corp. v. Ruderman*, 117 So. 3d 943, 948 (Fla. 2013). If possible, conflicting provisions of a contract are to be read in such a way to give a reasonable interpretation and effect to all provisions. *Cont'l Ins. Co. v. Collinsworth*, 898 So. 2d 1085, 1087 (Fla. 5th DCA 2005).

If a contract is "susceptible to more than one reasonable interpretation" and cannot be reasonably reconciled, then the contract is ambiguous and rules of contract interpretation must be applied. *State Farm Mut. Auto Ins. Co. v. Menendez*, 70 So. 3d 566, 570 (Fla. 2011); *Siegle v. Progressive Consumers Ins. Co.*, 819 So. 2d 732, 735 (Fla. 2002); *Discover Prop. & Cas. Ins. Co. v. Beach Cars of W. Palm, Inc.*, 929 So. 2d 729, 732 (Fla. 4th DCA 2006). Where the terms of a contract are ambiguous, the actual intention of the parties–the governing principle of contract construction–becomes a question of fact. *In re Gardinier, Inc.*, 831 F.2d 974, 976 (11th Cir. 1987); *Menendez*, 70 So. 3d at 570.

"[W]here two or more documents are executed by the same parties, at or near the same time and concerning the same transaction or subject matter, the documents are generally construed together as a single contract." *Bragg v. Bill Heard Chevrolet, Inc.*, 374 F.3d 1060, 1067 (11th Cir. 2004) (internal quotation omitted). In other words, if two or more contracts are "functionally intertwined," they must be "read and construed together." *Int'l Ship Repair & Marine Servs., Inc. v. Gen. Portland, Inc.*, 469 So. 2d 817, 818 (Fla. 2d DCA 1985); *see Clayton v. Howard Johnson Franchise Sys., Inc.*, 954 F.2d 645, 648 (11th Cir. 1992). Simmons contends that the Employment Agreement, the Asset Purchase Agreement (Dkt. 61-4), and the Non Compete and Confidentiality Agreement (Dkt. 61-8) must be construed together as a single contract, the obligations of which expired on June 30, 2009, two years before the alleged breach.

The Employment Agreement and the Non Compete and Confidentiality Agreement were executed on the same day, in relation to the same transaction, and both fundamentally relate to Simmons's employment as a Regional Manager for HearUSA upon its acquisition of Doctor's Hearing Center. The two contracts are therefore "functionally intertwined" and must be construed together. *See Benchmark Med. Holdings, Inc. v. Barnes*, 328 F. Supp. 2d 1236, 1257 (M.D. Ala. 2004) (considering employment and non-compete agreements together).

This does not mean, however, that the Employment Agreement and Non Compete and Confidentiality Agreement do not retain their individual meanings. In *Barnes*, the district court considered the enforcement of an employment contract and non-compete contract of a single employee. *Id.* at 1257. The court held that the contracts should be considered together, but it would nonetheless draw "distinctions where warranted on the basis of the language of the contracts and variations in the Plaintiff's protectable interest[s]" enforced against the employee "as a seller as opposed to an employee." *Id.* Likewise, Simmons' Employment Agreement and the Non Compete

10

and Confidentiality Agreement will be construed together, but distinctions may be drawn where warranted by the unambiguous language of the agreements.

## 2. **The Plain Meaning of the Contracts, Construed Together, Prohibit Simmons from Using Confidential Client Information.**

The parties do not dispute that the Non Compete and Confidentiality Agreement expired on June 30, 2009, prior to Simmons' actions giving rise to this suit. Simmons argues that because the two agreements must be construed together, it logically follows that if the Non Compete and Confidentiality Agreement expired on June 30, 2009, Section 7(a)(i)(B) of the Employment Agreement expired at the same time. Audiology takes the opposite approach, arguing that the expiration of the Non Compete and Confidentiality Agreement does not impact the continuing confidentiality obligations of Section 7(a)(i)(B) in the Employment Agreement.

When HearUSA acquired Doctor's Hearing Center, the Asset Purchase Agreement provided that HearUSA would acquire all of the assets of Doctor's Hearing Center, including all "confidential or proprietary information" and "patient . . . files and records" (Dkt. 61-4). Consistent with the Asset Purchase Agreement, Section 7(a)(ii) of the Employment Agreement makes client lists the "sole property of" HearUSA, to be returned to HearUSA at the termination of Simmons' employment or at any other time requested by HearUSA (*id.*). Sections 7(a)(ii)(B) and 7(c) likewise require Simmons to return HearUSA's property upon her termination (*id.*), and Section 7(a)(i)(B) prohibits Simmons from using or disclosing any "confidential matters," including client lists, "after the Employment Period, on any basis for any reason" (Dkt. 61-7 ¶ 7, at 5). The plain, unambiguous language of these five provisions make clear that client lists are the property of Audiology, as successor in interest to HearUSA, and that such property cannot be used after termination of her employment and must be returned to Audiology at the conclusion of her employment.

In the Non Compete and Confidentiality Agreement, on the other hand, Simmons agreed not to "use or divulge" any "customer data" for three years beginning June 30, 2006 (Dkt. 61-8 ¶ 2, at 3). In contrast to the Employment Agreement, the terms of the Non Compete and Confidentiality Agreement do not govern the disposition of Audiology's property once Simmons' employment is terminated. Rather, the Non Compete and Confidentiality Agreement restricts Simmons's use of confidential information she learns of while employed by Audiology, including customer data. The Employment Agreement and the Non Compete and Confidentiality Agreement therefore cover different sets of information and property. *Cf. Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1234-36 (11th Cir. 2009) (concluding that the retention of materials after employment, which did not necessarily violate a confidentiality agreement, could nevertheless violate a non-compete arrangement).

For that reason, Simmons' argument that the three-year limitation in the Non Compete and Confidentiality Agreement must be extended to Section 7 of the Employment Agreement is unpersuasive. Reading the contracts as a whole, the three-year limitation in the Non Compete and Confidentiality Agreement limits Simmons' use of confidential customer data for three years following the acquisition of Doctor's Hearing Center by HearUSA, while the requirement that Simmons return Audiology's customer lists contained in the Employment Agreement applies, by its plain language, to the conclusion of Simmons's employment with Audiology–whenever that may occur. The different time limits apply to different protectable interests of Audiology. *See Star Direct, Inc. v. Dal Pra*, 767 N.W.2d 898, 916 (Wis. 2009) ("Employers may have several protectable interests that apply in similar, though not exactly the same, situations and it makes sense to set these out in separate post-termination restrictive covenants.").

In *Barnes*, the court came to a similar conclusion and found that different time limits applied

12

to two different protectable interests of the employer. 328 F. Supp. 2d 1236. The employer in *Barnes* sued the employee to enforce a five-year restraint on the employee's use of customer data that was contained in the Purchase Agreement, as well as a two-year restraint in the Employment Agreement. *See id.* at 1267. The court found that both time limits applied, because they protected different interests of the employer. *Id.* Likewise, the different time limits in the two Agreements signed by Simmons apply in this context because they protect different interests of Audiology, and the plain language of the Agreements requires Simmons to return the clients lists at the conclusion of her employment and prohibits her from using them after her termination.

Simmons' argument that the three-year limitation of the Non Compete and Confidentiality Agreement must also apply to the Employment Agreement is therefore unpersuasive. That argument is inconsistent with the plain language of the contracts, and at least one other court has sided with the employer in an analogous situation. *See id.* at 1267. Simmons was therefore restricted by the terms of the Employment Agreement, which had not expired when she left Audiology.

### B. *The Restrictive Confidentiality Covenant Contained in the Employment Agreement Is Unreasonable in Duration.*

In the alternative, Simmons argues that the Employment Agreement contains an invalid restrictive covenant under Chapter 542 of the *Florida Statutes*.[9] Post-employment restrictive covenants are valid if they meet the conditions of § 542.335, *Florida Statutes. Envt'l Servs., Inc. v. Carter*, 9 So. 3d 1258, 1261-62 (Fla. 5th DCA 2009). The term "restrictive covenant" encompasses all contractual restrictions on post-employment behavior, including confidentiality provisions. *See id.* at 1261-12 (holding that confidentiality covenant was post-employment restrictive covenant and

---

[9]Simmons's inclusion of this argument as a basis for partial summary judgment on Count II is misplaced. This argument is more appropriately addressed to Count I, since Count I is a breach of contract claim based, in part, on the post-employment restrictive confidentiality covenant found in the Employment Agreement. Count II, on the other hand, is a statutory claim for misappropriation of trade secrets.

employer was entitled to injunctive relief); *Re/Max Int'l, Inc. v. Citmaxx Corp.*, No. 8:08-cv-2554-T-27TBM, 2009 WL 1883035, at *2 (M.D. Fla. June 30, 2009) (Whittemore, J.) ("In Florida, confidentiality agreements are considered restrictive covenants and are therefore subject to the limitations in § 542.335.").

Section 542.335(1) permits enforcement of restrictive covenants "so long as such contracts are reasonable in time, area, and line of business." The party seeking enforcement of the restrictive covenant must present a *prima facie* case that "one or more legitimate business interests justify[] the restrictive covenant," and that the specified restraint "is reasonably necessary to protect the legitimate business interest or interests justifying the restriction." §§ 542.335(1)(b), (1)(c). Legitimate business interests include trade secrets, "[v]aluable confidential business or professional information that otherwise does not qualify as trade secrets," and "[s]ubstantial relationships with specific prospective or existing customers, patients, or clients." §§ 542.335(1)(b)(1)-(1)(b)(3). After the enforcing party presents a *prima facie* case, the opposing party has the burden of proving the contractual restraint is overbroad, overlong, or otherwise not reasonably necessary to support the restriction. § 542.335(1); *Envt'l Servs.*, 9 So. 3d at 1262. If the restrictive covenant is overbroad or unreasonable, the court must "modify the restraint and grant only the relief reasonably necessary to protect such interest or interests." § 542.335(1)(c).

Simmons correctly argues that the confidentiality provision in section 7(a)(i)(B) of the Employment Agreement is unreasonable because it is indefinite in duration. *See* § 542.335(d)(1); *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1232 n.8 (11th Cir. 2009) (noting that indefinite restrictive covenants regarding confidential information have been found to be presumptively unreasonable); *PartyLite Gifts, Inc. v. MacMillan*, 895 F. Supp. 2d 1213, 1227 (M.D. Fla. 2012) (Whittemore, J.) ("Certainly, an indefinite non-solicitation provision is presumptively

unreasonable."); Dkt. 61-7 ¶ 7(a)(i)(B) ("Employee . . . covenants and agrees that . . . (B) after the Employment Period, on any basis for any reason, Employee shall not use or disclose [confidential matters] to anyone except authorized personnel of the Company or the Company's Affiliates.").[10]

If a restrictive covenant is unreasonable, the court must modify, or "blue pencil," the agreement and fashion an appropriate remedy, not void the restrictions. *PartyLite Gifts*, 895 F. Supp. 2d at 1227; *see* § 542.335(1)(c). A six-month restraint is presumptively reasonable under § 542.335(1)(d)(1) when the covenant is sought to be enforced against a former employee, while more than two years is presumptively unreasonable. In *PartyLite Gifts*, the indefinite confidentiality provision was modified to be enforceable for six months after the conclusion of employment, in order to protect the employer's legitimate business interests. *See PartyLite Gifts*, 895 F. Supp. 2d at 1227. Similar interests are protected by the confidentiality provision in this case.[11] The confidentiality restrictive covenant will therefore be modified to be effective for a period of six months from the conclusion of Simmons's employment with HearUSA.[12]

---

[10]Audiology contends that § 542.335 does not apply because "[t]rade secret and confidential information remain such until they become publicly available. For example, no one would claim that the Coca Cola trade secret formula only has to be maintained for 3 to 7 years." (Dkt. 66 at 16). That statement may be generally accurate with regard to the misappropriation of trade secrets, but it incorrectly states the standard applicable to restrictive covenants protecting confidential materials. As the court found in *Environmental Services*, post-employment restrictive covenants protecting confidential materials are subject to the overbreadth and reasonableness restrictions of § 542.335 in the same manner as non-compete and non-solicitation agreements.

[11]HearUSA considered patient files to be a substantial asset of the business and exhibited an intent to maintain confidentiality over patient files and information. *See* Dkt. 61-1 at 22:15-17 (HearUSA paid $25 per patient file when acquiring Doctor's Hearing Center from Simmons); *id.* at 23:8 (patient goodwill was "a lot of" the value of Doctor's Hearing Center when purchased by HearUSA); Dkt. 61-4 ¶¶ 1.3, 1.4 (intellectual property, including confidential or proprietary information, and "patient and supplier files and records" included in asset purchase by HearUSA).

[12]*See United Subcontractors, Inc. v. Godwin*, No. 11-81329-CV, 2012 WL 8652471, at *2 (S.D. Fla. Mar. 9, 2012) ("Admittedly, fashioning this duration is an inexact science, particularly on such a sparse record and when operating in a proverbial twilight zone between what Florida law considers presumptively reasonable and presumptively unreasonable.").

### C.    The Internal Policies and Procedures Do Not Create Contractual Obligations.

Simmons argues that a breach of HearUSA's internal policies and procedures does not allege

a cause of action because the policies and procedures are not enforceable contracts. Audiology

concedes that the policies and procedures are not enforceable contracts (Dkt. 66 at 10-11).[13]

Summary judgment is therefore appropriate on this basis.

## IV.    COUNT II: MISAPPROPRIATION OF TRADE SECRETS AGAINST ALL DEFENDANTS

Count II alleges that Simmons, Gallegos, Ligon, and Physicians Hearing violated Florida's

Uniform Trade Secrets Act, §§ 688.001-688.009, *Florida Statutes*, by misappropriating customers'

contact information and medical history, which Audiology alleges constitute trade secrets. "Under

Florida law, a trade secret consists of information that (1) derives economic value from not being

readily ascertainable by others and (2) is the subject of reasonable efforts to maintain its secrecy."

*Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1998); *see* §

688.002(4), Fla. Stat.[14] Section 688.004(1) permits plaintiffs to bring a cause of action to recover

damages for misappropriation of trade secrets.

Simmons argues that she is entitled to summary judgment on Count II because the alleged

---

[13]Audiology also agrees with Simmons that the internal policies and procedures do not amend the Employment Agreement (*see* Dkt. 61 at 15).

[14]Section 688.002(4) defines a trade secret as

> information, including a formula, pattern, compilation, program, device, method, technique, or process that:
>
> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

§ 688.002(4), Fla. Stat.

misappropriation occurred after the confidentiality provisions expired on June 30, 2009. As authority, she cites *ECT International, Inc. v. Zwerlein*, 597 N.W.2d 479 (Wis. Ct. App. 1999). In *ECT*, the employee signed a confidentiality agreement, which provided that customer lists were "considered confidential information" of the employer and that the employee could not "make use of, nor divulge, such Information to anyone . . . either during or for a period of *one year* after the termination of [his] employment." *Id.* at 484. Thirteen months after his termination, the employee disclosed the alleged trade secrets. *Id.* at 485. Applying Wisconsin's version of the Uniform Trade Secrets Act, which is nearly identical to Florida's, the court held that the customer list was no longer a protectable trade secret because the confidentiality agreement was limited to a one-year period. *Id.* "By limiting the period in which an employee agreed not to divulge trade secrets [the employer] manifested its intent that after one year there was no need to maintain the secrecy of any sensitive and confidential information [the employee] learned while employed." *Id.*

Unlike the confidentiality agreement in *ECT*, the confidentiality provisions of the Employment Agreement signed by Simmons had yet to expire when the alleged misappropriation occurred, even when modified to six months following Simmons' separation from Audiology. *ECT* is therefore inapposite. At the very least, the indefinite duration of the confidentiality provision of Simmons' Employment Agreement creates a genuine dispute of material fact regarding whether Audiology used reasonable efforts to maintain the secrecy of its customer lists. *See Elm City Cheese Co., Inc. v. Federico*, 752 A.2d 1037, 1050 (Conn. 1999) ("The question of whether, in a specific case, a party has made reasonable efforts to maintain the secrecy of a purported trade secret is by nature a highly fact-specific inquiry."). Summary judgment on Count II is therefore not appropriate.

17

## V.    COUNT IV: BREACH OF FIDUCIARY DUTY AGAINST SIMMONS AND GALLEGOS

Count IV alleges that Simmons and Gallegos breached their fiduciary duties to Audiology by "selling hearing aids and other related services to [Audiology's] patients . . . and by misappropriating and wrongfully utilizing Audiology's confidential patient information" (Dkt. 47 ¶ 63). Simmons and Gallegos argue that they are entitled to summary judgment on Count IV because Count IV is preempted by the FUTSA.

The provisions of the FUTSA "displace conflicting tort, restitutory, and other law of [Florida] providing civil remedies for misappropriation of a trade secret." § 688.008(1). In other words, "other torts involving the same underlying factual allegations as a claim for trade secret misappropriation will be preempted by FUTSA." *New Lenox Indus., Inc. v. Fenton*, 510 F. Supp. 2d 893, 908 (M.D. Fla. 2007) (citing *Am. Honda Motor Co. v. Motorcycle Info. Network, Inc.*, 390 F. Supp. 2d 1170, 1180-81 (M.D. Fla. 2005)); *see K.C. Multimedia, Inc. v. Bank of Am. Tech. & Ops., Inc.*, 171 Cal App. 4 th 939, 958 (Cal. App. 2009) (California's version of the Uniform Trade Secrets Act "preempts common law claims that are based on the same nucleus of facts as the misappropriation of trade secrets claim for relief.") (internal quotations omitted). The FUTSA does not preempt, however, contractual remedies (whether or not they are based upon misappropriation of a trade secret) or other civil remedies that are "not based upon misappropriation of a trade secret." *Id.* § 688.008(2). If there are "material distinctions between the allegations comprising the additional torts and the allegations supporting the FUTSA claim," then the additional torts are not preempted. *New Lenox*, 410 F. Supp. 2d at 908 (citing *Allegiance Healthcare Corp. v. Coleman*, 232 F. Supp. 2d 1329, 1335-36 (S.D. Fla. 2002)).

Audiology correctly argues that Count IV is not preempted because the misappropriation

18

alone does not comprise the entirety of the underlying wrong (Dkt. 66 at 17). The crux of Audiology's claim for breach of fiduciary duty is the sale of hearing aids and related services to Audiology's customers by Simmons while she was still working for Audiology, and Gallegos's assistance in those sales. The use of the alleged trade secrets–confidential patient information–is a subsidiary allegation in support of the claim, not its main factual basis. Counts II and IV do not "involv[e] the *same* underlying factual allegations," and Count IV is therefore not preempted by the FUTSA. *New Lenox*, 510 F. Supp. 2d at 908 (emphasis added). *Accord Mortgage Now, Inc. v. Stone*, No. 3:09-cv-80-MCR-MD, 2009 WL 4262877, at *7 (N.D. Fla. Nov. 24, 2009) (no preemption where additional breach of fiduciary duty claim arises from relationship between employer and employee, which is distinct from misappropriation of trade secrets).

## VI. COUNT V: TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIPS AGAINST SIMMONS AND GALLEGOS

### A. The Tortious Interference Claim Is Not Barred by the FUTSA.

Count V alleges that Simmons and Gallegos tortiously interfered with Audiology's business relationships by using Audiology's confidential information (Dkt. 47 at ¶¶ 67-72). Defendants argue that this claim is also preempted by the FUTSA. As with Count IV, however, the crux of Count V is not the misappropriation of trade secrets, but the use of that information to interfere with Audiology's business relationships. Accordingly, Count V is not preempted by the FUTSA. *Accord Office Depot, Inc. v. Impact Office Prods., LLC*, 821 F. Supp. 2d 912, 921 (N.D. Ohio 2011) (tortious interference claim not preempted by Ohio UTSA because claim possesses an "independent factual basis"); *Precision Automation, Inc. v. Technical Servs., Inc.*, No. 07-CV-707-AS, 2007 WL 4480736, at *2 (D. Or. Dec. 14, 2007) (tortious interference claim not preempted by trade secrets

statute because the "claim is not dependant on allegations of misappropriated trade secrets"); *Jenkins v. APS Ins., LLC*, ___ S.W.3d ___, 2013 Ark. App. 746 (Ark. Ct. App. Dec. 18, 2013) (tortious interference claim not preempted by Arkansas UTSA because claim based on in-person solicitation of clients); *Raven Indus., Inc. v. Lee*, 783 N.W.2d 844, 848-49 (S.D. 2010) (tortious interference claim not preempted by South Dakota UTSA); *Mortgage Specialists, Inc. v. Davey*, 904 A.2d 652, 667 (N.H. 2006) (tortious interference with advantageous relations claim not preempted by New Hampshire UTSA); *Ethypharm S.A. France v. Bentley Pharms., Inc.*, 388 F. Supp. 2d 426, 434-35 (D. Del. 2005) (tortious interference claim not preempted by UTSA); *Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co.*, 270 F. Supp. 2d 943, 949-50 (W.D. Mich. 2003) (tortious interference claim not preempted by UTSA).

**B.      *Whether Simmons's Interference Is Privileged Is a Question of Fact for the Jury.***

Simmons also argues that she is entitled to judgment as a matter of law because any communications with Audiology's customers or interference with the business relationships between Audiology and its customers were "lawful competition" because she was no longer subject to the non-solicitation and non-compete contracts. She also contends that Audiology's mere "expectancy" in the continued business of its customers cannot give rise to a claim for tortious interference with an advantageous business relationship.

To prove a claim for tortious interference with an advantageous business relationship, a plaintiff must show "(1) the existence of a business relationship that affords the plaintiff existing or prospective rights; (2) the defendant's knowledge of the business relationship; (3) the defendant's intentional and unjustified interference with the relationship; and (4) damage to the plaintiff. *Int'l Sales & Serv., Inc. v. Austral Insulated Prods., Inc.*, 262 F.3d 1152, 1154 (11th Cir. 2001). A

business relationship need not be evidenced by a contract, but it generally requires "an understanding between the parties [that] would have been completed had the defendant not interfered." *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994); *see Int'l Sales*, 262 F.3d at 1154.

Once a plaintiff such as Audiology demonstrates a *prima facie* case of tortious interference, the burden shifts to the defendant to justify the interference as lawful competition. *Greenberg v. Mt. Sinai Med. Ctr.*, 629 So. 2d 252, 256 (Fla. 3d DCA 1993). If Simmons can prove that the interference was "lawful competition," she will not be liable for tortious interference. *Id.* at 255 (citing *Unistar Corp. v. Child*, 415 So. 2d 733, 734-35 (Fla. 3d DCA 1982)).

To establish the competition privilege, Simmons must show (1) the Audiology-patient relationship concerned a matter involved in the competition between Simmons and Audiology; (2) Simmons did not employ improper means; (3) Simmons did not intend to create or continue an illegal restraint of competition; and (4) Simmons' purpose was at least in part to advance her interest in competing with Audiology. *Int'l Sales*, 262 F.3d at 1159. The competition privilege entails "an examination of the defendant's 'conduct, its motive, and the interests it sought to advance.'" *Sec. Title Guar. Corp. of Baltimore v. McDill Columbus Corp.*, 543 So. 2d 853, 855 (Fla. 2d DCA 1989) (quoting *Smith v. Emery Air Freight Corp.*, 512 So. 2d 229, 230 (Fla. 3d DCA 1987)). "[S]o long as improper means are not employed, activities taken to safeguard or promote one's own financial . . . interests are entirely non-actionable." *Ethyl Corp. v. Balter*, 386 So. 2d 1220, 1225 (Fla. 3d DCA 1980); *see Johnson Enters.*, 162 F.3d at 1321. Improper means include physical violence, misrepresentations, intimidation, conspiratorial conduct, illegal conduct, and threats of illegal conduct. *Fla. Std. Jury Instructions in Civil Cases* § 408.6 (2013).

Whether improper means were employed is a question typically left for determination by the

21

jury. *See Int'l Sales*, 262 F.3d at 1159; *Mfg. Research*, 693 F.2d at 1040 ("[W]hen there is room for different views, the determination of whether the interference was improper or not is ordinarily left to the jury, to obtain its common feel for the state of community mores and for the manner in which they would operate upon the facts in question.").

Simmons first argues that her alleged interference was justified by the competition privilege because she was no longer bound by the non-solicitation and non-compete contracts. This argument fails because, as has been found, the confidentiality provisions of the Employment Agreement had not expired at the time of the alleged interference. Moreover, Audiology has adduced sufficient evidence to raise a genuine issue of material fact as to whether Simmons' conduct violated a confidential relationship and therefore was not justified by the competition privilege. *Accord DeLong Equipment Co. v. Wash. Mills Abrasive Co.*, 887 F.2d 1499, 1518-19 (11th Cir. 1989) ("The privilege defense is not available where interference is achieved through actions taken in violation of a confidential relationship.") (Georgia law). The question of competition privilege is therefore best left for resolution by the jury. *See Int'l Sales*, 262 F.3d at 1159.

Simmons also contends that Audiology's mere "expectancy" in the continued business of its customers cannot give rise to a claim for tortious interference with an advantageous business relationship. This argument is contrary to binding precedent of the Eleventh Circuit and the Florida Supreme Court, which have consistently found business relationships subject to tortious interference claims even when the parties had no apparent obligation to continue the relationships. *See Int'l Sales*, 262 F.3d at 1156; *Ins. Field Servs.*, 384 So. 2d at 304-06; *Tamiami Trail Tours*, 463 So. 2d 1126, 1127-28; *Magre v. Charles*, 729 So. 2d 440, 444 (Fla. 5th DCA 1999); *see also Rest. (2d) of Torts* § 766B *cmt.* c (1977) ("Also included [as tortious interference with a business relationship] is

22

interference with a continuing business or other customary relationship not amounting to a formal contract.").

In sum, the tortious interference claim is not preempted by the FUTSA, and Simmons has not demonstrated that she is entitled to the competition privilege for her actions. She is therefore not entitled to summary judgment on Count V.

## VII.   COUNT VI: BREACH OF CONTRACT AGAINST GALLEGOS

Count VI alleges that Gallegos breached the confidentiality and non-compete provisions of the 2007 Gallegos Agreement and the policies and procedures she signed when she began with HearUSA in 2006 (Dkt. 47 ¶ 75). Gallegos makes several arguments for why she is entitled to summary judgment on the breach of contract claim. First, she argues that the 2011 Gallegos Letter is a novation of the 2007 Gallegos Agreement, superseding and terminating all provisions of the 2007 Gallegos Agreement. Second, Gallegos argues that the policies and procedures do not create enforceable contractual obligations. Third, Gallegos argues that the breach of contract claim fails because the 2007 Gallegos Agreement does not protect any legitimate business interests of Audiology.

### A.   *Genuine Disputes of Material Fact Remain as to Whether the 2011 Offer Letter is a Novation of the 2007 Agreement.*

Gallegos argues that the 2011 Gallegos Letter is a novation of the 2007 Agreement, which terminates all of her obligations under the 2007 Agreement. She argues that because the 2007 Agreement is superseded in full by the novation, Audiology's claim for breach of the 2007 Agreement necessarily fails. Audiology contends that the signed 2011 Gallegos Letter is not a novation or even a contract, but merely an "offer letter," which was never accepted.

"A novation is a mutual agreement between the parties for the discharge of a valid existing obligation by the substitution of a new valid obligation." *Aronowitz v. Health-Chem Corp.*, 513 F.3d 1229, 1237 (11th Cir. 2008) (quoting *Jakobi v. Kings Creek Vill. Townhouse Ass'n*, 665 So. 2d 325, 327 (Fla. 3d DCA 1995)). "Novation results not from the mere substitution of one writing for another, but only from the substitution of a new obligation for another–with intent to extinguish the old." *Capital Nat'l Bank of Tampa v. Hutchinson*, 435 F.2d 46, 49 (5th Cir. 1970) (Florida law).

Four elements must be present to effectuate the novation of a binding contract: (1) a previously valid contract; (2) agreement of the parties to cancel that contract; (3) a new valid and binding contract; and (4) agreement of the parties that the new contract will replace and extinguish the old one. *Id.* (citing *Thompson v. Jared Kane Co.*, 872 So. 2d 356, 361 (Fla. 2d DCA 2004); *Jakobi*, 665 So. 2d at 327). Whether a novation occurs "is controlled by the intention of the parties." *Lakeland Silex Brick Co. v. Jackson & Church Co.*, 168 So. 411, 413 (Fla. 1936); *Electro-Protective Corp. v. Creative Jewelry by Kempf, Inc.*, 513 So. 2d 190, 192 (Fla. 5th DCA 1987). And the burden of proving a novation is on the party who asserts it. *Electro-Protective*, 513 So. 2d at 192.

The parties agree that the 2007 Agreement is a previously valid contract, but disagree as to the remaining three elements, primarily with regard to the parties' intent with respect to the 2007 Agreement. Gallegos argues that a merger clause in the 2011 Gallegos Letter is evidence of the parties' intent to cancel and replace the 2007 Agreement, while Audiology argues that the written terms of the 2011 Gallegos Letter offer no clear intent of the parties to cancel the 2007 Agreement. Audiology further argues that the 2011 Gallegos Letter does not satisfy the third novation element because it is not a valid and binding contract.

Under Florida law, "a clear agreement or manifestation of intention of both parties to

[effectuate a novation] is essential." *U.S. v. Nill*, 518 F.2d 793 (5th Cir.1975) (citing *Murphy v. Green*, 135 So. 531, 534 (Fla. 1931)). In the absence of a clear and unambiguous agreement, there must be a clear manifestation of a mutual intention that the agreement was a novation. *Id.* The intent of the parties may be "inferred from the totality of the circumstances surrounding the transaction." *Aronowitz*, 513 F.3d at 1237 (citing *Thompson*, 872 So. 2d at 361).

The question of intent is "generally a question of fact" for the jury, especially when there are disputes concerning the terms of an agreement and the intention of the parties at the time of its making. *Id.* (quoting *Wolowitz v. Thoroughbred Motors Inc.*, 765 So. 2d 920, 923 (Fla. 2d DCA 2000)); *Electro-Protective*, 513 So. 2d at 192. Where the terms of an agreement are not in doubt, however, the existence of a novation is a question of law for the court. *Aronowitz*, 513 F.3d at 1237; *Electro-Protective*, 513 So. 2d at 192.

A review of the 2011 Gallegos Letter, even assuming that it is a new valid contract, reveals no clear manifestation of mutual intention to effectuate a novation of the 2007 Agreement. The 2011 Gallegos Letter does not mention the 2007 Agreement. And it does not unambiguously preclude the application of prior contracts on the same subject. Nor does the additional evidence presented by Gallegos, considered as a whole, satisfy her burden of demonstrating an intention to effectuate a novation. *See Aronowitz*, 513 F.3d at 1237.

Gallegos argues that the merger clause in the 2011 Gallegos Letter is conclusive evidence of the parties' intention to create a novation. The presence of a merger clause, however, is not conclusive proof of intent to effectuate a novation. *See In re Cohen*, 422 B.R. 350, 374 n.7 (Bankr. E.D.N.Y. 2010) ("Although a merger clause certainly provides some evidence of parties' intent to form a novation, the presence of a merger clause is not determinative of the novation inquiry."); *see,*

*e.g., Langhoff Props., LLC v. BP Prods. N. Am., Inc.*, 519 F.3d 256, 262-63 (5th Cir. 2008) (under Louisiana law, merger clause is not probative of the parties' intent concerning a novation–rather, merger clause should be interpreted as preventing communications prior to agreement from being used subsequently to alter rights and duties set forth in the agreement); *Abuelhija v. Chappelle*, No. 08 CV 3679(HB), 2009 WL 1883787, at *6 (S.D.N.Y. June 29, 2009) ("An intent to extinguish earlier contractual obligations cannot be inferred from a standard merger clause simply because the parties to the later agreement also entered [into] an earlier contract on a related topic."); *Multimedia Patent Trust v. DirecTV, Inc.*, No. 09-cv-00278-H(CAB), 2011 WL 3610098, at *3 (S.D. Cal. Aug. 16, 2011) ("A boilerplate merger clause 'does not evidence a clear expression of intent to extinguish a separate and distinct written contract.'") (quoting *Abuelhija*, 2009 WL 1883787, at *6); *Scheer v. Tollman*, No. 94 CIV. 4382 (JFK), 1996 WL 420172, at *5 (S.D.N.Y. July 25, 1996) (integration clause not dispositive of parties' intent).[15]

Those decisions finding merger clauses not to be clear expressions of an intent to effectuate novations are consistent with those discussing the purpose of merger clauses. The purpose of a merger clause is not to extinguish prior contractual obligations. Rather, a merger clause "is a highly persuasive statement that the parties intended the agreement to be totally integrated and *generally works to prevent a party from introducing parol evidence to vary or contradict the written terms.*" *Jenkins v. Eckerd Corp.*, 913 So. 2d 43, 53 (Fla. 1st DCA 2005) (emphasis added).

Gallegos correctly notes that Florida's Second District Court of Appeal held in *Waters v. Sundstrom* that the "merger of an earlier contract into a later one extinguishes the earlier one." 386

---

[15]*But see BlueEarth Biofuels, LLC v. Hawaiian Elec. Co., Inc.*, Civ. No. 09-00181-DAE-KSC, 2010 WL 4715717, at *15 (D. Haw. Nov. 15, 2010) (merger clause evidence of the parties' intent to effectuate novation).

So. 2d 54, 57 (Fla. 2d DCA 1980) (citing *Nat'l Cash Register Co. v. Modern Transfer Co.*, 302 A.2d 486 (Pa. Super. 1973)). The merger clause in *Waters*, however, left no doubt that the parties unambiguously intended for the trust agreement at issue to replace "all prior written memoranda and all prior oral conversations," and to abrogate the prior subscription agreement.[16] *Id.* The merger clause in the 2011 Gallegos Letter, in contrast, states only that "this Offer Letter encompasses the entire promises, commitments, representations, statement of facts, and intentions set forth by Audiology Distribution, LLC *concerning this offer of employment*." (Dkt. 62-3) (emphasis added). The clause is silent as to the status of prior employment agreements and the continuity of obligations contained in those agreements.

In sum, Gallegos has not conclusively demonstrated an absence of genuine issues of material fact as to whether the 2011 Gallegos Letter is a novation of the 2007 Agreement. Even assuming that the 2007 Agreement is a valid and enforceable contract, genuine issues remain as to whether the parties intended for the terms of the 2011 Gallegos Letter to comprehensively extinguish all of the obligations in the 2007 Agreement. The plain language of the 2011 Gallegos Letter, considered with the totality of the circumstances surrounding the Letter, does not conclusively establish mutual intent to effectuate a novation. *Accord Electro-Protective*, 513 So. 2d at 192 ("Plaintiff's contention that the 1980 agreement unquestionably superseded the 1975 contract is not convincing because the document itself does not necessarily support that conclusion.").

### B.   *The Internal Policies and Procedures Do Not Create Contractual Obligations.*

As with the breach of contract claim against Simmons, Audiology concedes that the internal

---

[16]The merger clause in *Waters* read, in full: "This Trust Agreement represents the entire agreement among the parties hereto, and all prior written memoranda and all prior oral conversations are merged herein."

policies and procedures do not create contractual obligations that could serve as the basis for a breach of contract.

### C.   The 2007 Agreement Protects Legitimate Business Interests.

Finally, Gallegos argues that the breach of contract claim must fail because the restrictive covenants in the 2007 Agreement do not protect any legitimate business interests. This argument is unpersuasive. The 2007 Agreement seeks to protect several legitimate business interests, including trade secrets, valuable confidential business or professional information, and substantial relationships with specific prospective or existing patients. §§ 542.335(1)(b)(1)-(3), Fla. Stat.; *East v. Aqua Gaminv, Inc.*, 805 So. 2d 932, 934 (Fla. 2d DCA 2001) (customer list qualifies as trade secret); *Hapney v. Central Garage, Inc.*, 579 So. 2d 127, 131 (Fla. 2d DCA 1991) (trade secrets, confidential business lists, records, and information constitute legitimate business interests protectible by restrictive covenants)[17]; *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hagerty*, 808 F. Supp. 1555, 1558 (S.D. Fla. 1992) (customer list "clearly" protected as legitimate business interest).[18]

## VIII.   CONCLUSION

Other than Audiology's concession that its internal policies and procedures do not create contractual obligations and Simmons' contention that the confidentiality provision of the Employment Agreement is unreasonable in duration, none of Simmons' or Gallegos's argument are persuasive. There remain genuine disputes of material fact concerning whether Simmons breached the Employment Agreement, whether Simmons' interference with the relationships between

---

[17]*Hapney* was disapproved on other grounds in *Gupton v. Village Key & Saw Shop, Inc.*, 656 So. 2d 475 (Fla. 1995).

[18]Gallegos further contends that the patient lists cannot constitute legitimate business interests because she is not a board certified audiologist. She offers no support for this argument.

Audiology and its customers was justified, and whether the 2011 Gallegos Letter effectuated a novation of the 2007 Agreement. Defendants' remaining arguments as to Counts II, IV, and V are likewise unavailing. Accordingly,

1) Defendant Donna Simmons' Second Amended Motion for Partial Summary Judgment (Dkt. 61) is **GRANTED** *in part* and **DENIED** *in part*. The motion (Dkt. 61) is granted to the extent that Audiology's internal policies and procedures cannot serve as the basis for the breach of contract claim in Count I, and to the extent that Section 7(a)(i)(B) of the Employment Agreement is unreasonable in duration and is modified to be effective for one year after Simmons terminated her employment with Audiology. In all other respects, the motion (Dkt. 61) is denied.

2) Defendant Danelle Gallegos' Second Amended Motion for Partial Summary Judgment (Dkt. 62) **GRANTED** *in part* and **DENIED** *in part*. The motion (Dkt. 62) is granted to the extent that Audiology's internal policies and procedures cannot serve as the basis for the breach of contract claim in Count I. In all other respects, the motion (Dkt. 62) is denied.

**DONE AND ORDERED** this 27th day of May, 2014.

JAMES D. WHITTEMORE
United States District Judge

Copies to: Counsel of record

29